All right, Ms. Penagos. Ms. Penagos. In 1963, the Equal Pay Act was enacted into law as a part of the New Frontier Program. The EPA abolished wage disparity based on sex in an effort to end the gender pay gap. Five decades later, on its website, the Department of Labor reports that women still earn 19 to 23 percent less than men. Ma'am, you need to talk a little more slowly. I can't understand you. Five decades later, the Department of Labor reports that women still earn approximately 20 percent less than men, and that wage gap— Okay, you know, we're not a jury. You have issues in your case. If you want to present a case, then you tell us what the issues in your case are and what the record is in your case. We're not interested in editorial, all right? This case is about one of the four limited defenses to strict liability under the EPA, the fourth defense, a factor other than sex. This case is not simply about negotiations for salary. This case is about—is unique because it is about the opportunity to negotiate that is disparately provided between the man and the woman. In this case, the facts are uncontested. Both employees were interviewed and hired at the same time by the same team of five college managers. The female is equally or better qualified in all respects as reflected by her six-page resume compared to the male's two-page resume. They work in the same job, side by side, and remain there today. They work for the same supervisor. This is more than the EPA's three prima facie elements. We rely on the seven principal cases that we cite at our brief, pages 24 through 35. All of these seven cases from this circuit and two others affirm that negotiation cannot be a factor other than sex. This trend continues. We submitted a Rule 28J letter in July. Youngblood v. George Wallace College, another college case. Let me ask you this because, you know, I'm not sure you have to bite off that big a bite. Do we have to find that negotiations aren't a factor other than sex, or do we have to find only that in this case, because she was given a different set of rules for negotiating, you're not allowed to negotiate, but this guy over here is, that that cannot prove the defense or be part of the defense, at least on summary judgment. I mean, isn't that all we need to deal with? Leave for another day whether some brilliant guy who can really negotiate well can run past a woman who can't or whatever? Yes, it is the latter, absolutely. This case is not about, that's why I said this case is not simply about negotiations. This case is about desperately providing negotiations. It sounds like a Title VII case, but it's not. It's a textbook EPA case. But there was a difference here, which is that the man came back and gave a counteroffer and your client didn't. Each was given the same offer. At the time the offer— The man told he's not allowed to negotiate. Could she finish that answer, please? Yeah, go ahead. The March 6th email from the manager in HR does not say he rejected the offer. It was never rejected. There's no evidence of that. What she says is, quote, he has asked to negotiate salary. Dee Woody in her affidavit uncontested says, I asked to negotiate salary and was told there is no negotiations by a man who was copied on the March 6th email 21 days before she accepted the offer. Someone could have said the procedures and policies that the college didn't follow where they consider all of these different considerations. The key fact here is that Dee Woody was offered the job on March 6th, as was Mr. Korter. And then they started comparing all of Mr. Korter's qualifications, the six factors. He speaks Spanish. He was in the military. He has the biggest skill set. He's been with us. So has she for 12 years. He is better than all of the other candidates. Ms. Woody at that time was not a candidate. She was an offeree. She had gotten her offer. He could not be comparing Mr. Korter to Ms. Woody because she was already okay. Again, they don't seem to be arguing that the salary differential is justified by anything other than the negotiation. And that's why, to me, this is almost like a law school hypothetical because you almost never have people that are actually totally equal in every single credential. Their argument is simply he negotiated, she didn't. I thought your argument was the rules were different. He was allowed to negotiate. Am I misunderstanding that? No, that is absolutely right. I don't know why we keep traipsing off in these other directions. I don't know what Korter said, but the only record evidence is two statements. I asked to negotiate, says Dee Woody. Mr. Korter has asked to negotiate salary. The next day, they start negotiating with him. Let's pay him 53. Let's pay him 56. She was told no. By the man, Mr. Little, who was to be her supervisor, he said HR will not allow any negotiations. This is it. She had to think about it for 21 days while they negotiated with the mail. Why couldn't they say, hey, wait a minute, Mr. Little, I told her no. Maybe we should negotiate with her, too. Twice. The March 7th email, the March 26th email. The college states this pushes internal equity because we have already offered the woman at 41. I want to get clear in my head. This is an affirmative defense, right? The burden is on the college. If we were to reverse here, that just sends it back for whatever, trial, whatever. In other words, I could still prevail on the defense, but just saying as a matter of law you haven't proved that this negotiation was the factor. I believe if this court finds that it was desperately provided, the college only has one . . . when they answered this lawsuit, they had no defense. They did not plead the fourth defense. It wasn't until we filed a motion that they amended their pleadings and pled the fourth defense. The only question for the district court is, do they have a defense to strict liability? If this court says, you can't desperately provide negotiations, you have no defense, the case is over. We're just talking about damages. Are they agreeing that they desperately provided? They're saying, yes, we told Mrs. Woody she couldn't negotiate, but we told Mr. Ford he could? Or are they just saying, okay, that's her story, and we have to accept that for summary judgment? The only record evidence, and that's all we can look at, is Washington, Seymour, and the March 7th email that all say he asked to negotiate, and here we go. The record is uncontested. They didn't dispute Dee Woody's statement. The one statement she has on the first page of her affidavit, I asked to negotiate salary, same words, and I was told no. There are two, as I said, our position in this case is that any comparison, and I have the chronological record evidence charts, two pages, it's got red printing on it, and it is verbatim from . . . It's really not very attentive of you to walk up here with manila folders and hand them in at the last minute, and then I've got to sit here and sort all those out while we're trying to hear oral argument. As far as I'm concerned, I'm going to ignore your handouts. The chronology chart is on pages two through four of Appellant's reply brief. It is a side-by-side mirror image of the facts in this case, what happened between February and when they first began the job in April. Every single thing is identical except Woody's column is blank. There is no negotiations because at the top of the page it says, I asked to negotiate and I was told no, and the negotiations continue. They both accept. She accepts one day before he does. They start the next week. We believe there is no intellectually honest way to allow wage disparity when we have mirror images not only in the lack of negotiation, but if you look at the skills comparison chart, which is pages seven through eight of our reply brief, when we take all of the six factors that the college sets out in its March 26th, we think for these six reasons he's better than the other candidates, not Woody. If you look at the skills, her six-page resume, his four, every single thing that the college looked at, she is equal or far better. This is not a skills comparison case. If we reverse the summary judgment on the EPA claim, does that mandate, why couldn't we affirm it on the gender discrimination claim? Is it your position that you can't have one without the other? No, it is not our position. We believe that the gender discrimination is separate apart based on gender-related remarks made by Mr. Little. There was no pending motion on these. The district court dismissed them sui sponte. The two claims are side by side, although they're parallel and they have the same four defenses, the damage model is different, and there are different facts. Wage disparity is a Title VII claim, but she also has additional ones that the court dismissed. And for that reason, we would ask that our motion for summary judgment on the affirmative defense be granted, that the college's motion that was granted be reversed, and that the gender-related claims, Mr. Little's, the statements that are in footnote, it's in the brief, footnote 47, I believe, the litany of statements that those be sent back to the All right. You've saved time for rebuttal. I have. Ms. Oxford? Good morning, and may it please the court. My name is Susan Oxford. I represent the Equal Employment Opportunity Commission, as amicus curiae in this case. Judge Haynes, yes, the only issue before this court is whether the college offered the opportunity to negotiate equally to two candidates who otherwise are virtually identical. And it is rare to have a situation like this, where two people are hired to perform not just similar jobs, but the same job, who come to the employer with virtually identical qualifications, and who result with such a great disparity in their pay, despite the fact that the college acknowledged the, quote, internal equity concerns at the time it was And so I want to be clear, we don't have to decide whether the concept of negotiating, in general, could be an other-than-sex factor. We just, in this case, to reverse, would have to find that the rules were different, that a woman was given a set of rules where she just wasn't allowed to play the game, whereas the man was allowed to play the game, so of course he makes a better score, so to speak. Absolutely. Okay. And this court doesn't need to decide whether the plaintiff would ultimately prevail on that, but on summary judgment, as an affirmative defense, this was the college's burden to establish, beyond any reasonable doubt, that no reasonable juror could fail to agree with the college's defense, and the evidence is plainly adequate for a jury to find to the contrary. With respect to the Title VII claim— Can I just ask, because you represent the EOC, and so I want to get sort of a national view here. I mean, to what degree, if the woman is given a different set of rules—we're not going to let you play in the same basketball court, but we'll still let him play in this court—how much is she required to protest that? Because it seems like the argument is, well, she accepted her boss, her boss-to-be's statement that you cannot negotiate, and maybe she should have gone and argued to somebody else, or she wasn't aggressive enough, or whatever. How does that play in here? I mean, help me with that. In this instance, she was not required to do any more than she did because she was speaking to the director of the corporate college. She was being hired—she and Corder were both being hired to work at the corporate college. This was their future boss, and he was not just a low-level manager at the college, but someone who, she could presume, understood the rules. And he spoke unequivocally and said, absolutely, there is no possibility of negotiation. He did not say, I'm not sure. We need to check with HR. I'm not the person to ask. So given the circumstances here where he spoke unequivocally and gave her no room to think that he didn't represent the college's absolute policy, and furthermore, where the So there was no way she could have just gone online and determined, or picked up a handbook and seen that this was available to her. Under these circumstances, there was no need for her to go further and press the issue. And the district court seemed to think it was significant that she spoke to someone who did not himself have the authority to approve a higher salary, and that Corder spoke to Don Washington from HR. The court failed to appreciate that Don Washington also had no authority to approve a higher to the person who did. And Director Little, to whom Woody made her request, he would have known, and a jury could find on this record that he would have already known, but if he didn't, by the time he started receiving the copies of the emails that HR was sending to Seymour saying that Corder is requesting to negotiate a higher salary, Little was copied on all those emails. He knew that this was available. He knew it was underway with respect to the other candidate. He, a jury could find under these circumstances that the college failed to treat two candidates disparately based on their gender. So in response, I think it was Judge Barksdale who asked, what does this do to the Title VII claim on these facts? This is a classic case of disparate treatment under Title VII, in addition to a classic Equal Pay Act claim. So we believe that there is Do you disagree with what I understood counsel for the plaintiff to say? I understood her to say that gender discrimination was based on the comments, and now you're saying it's not based on the comments, it's based on the fact that she wasn't allowed to negotiate. I believe what plaintiff's counsel was arguing is that the comments are what would allow a jury to infer that the motive for what Mr. Little did, Director Little, was based on gender bias. But the actual disparate treatment is the way they would do it. Yes. I see I have no further time. If the Court has no further questions. Thank you, Ms. Oxford. And we appreciate the participation of the EEOC. And I also want to thank you for focusing on the facts of the case and not trying to give us some big overview of what's happening all across the country or whatever. All right. Mr. Bradshaw. May it please the Court. Good morning, Your Honors. Miles Bradshaw, Counsel for Houston Community College. I would point out that one item and probably the biggest item of this case and how you're going to decide this case, to Judge Haynes' point, is what is the Court's job here? The thing that's being overlooked is this is a de novo review of the summary judgment. This Court can look at all the evidence that was presented. In fact, the parties agreed that all the evidence presented cross motions would be considered for all purposes. And we can affirm on any basis that's in the record of this case? Absolutely. To Judge Haynes' point, you don't have to make a very, you don't have to make the ruling that negotiation is in and of itself a factor other than sex. Now, I would argue that there are some cases out there and there's good reason to do that. In fact, Judge Smith . . . Can you state that last comment again about negotiation in and of itself? Right. Rephrase that. I think the Court could go two ways here. They could rule that, yes, negotiation in and of itself is a factor other than sex under the number four defense. Judge Smith in the Resnick case, I believe, alluded to that and said that any one of the There's a case, there are many cases. A particular case that specifically held the same thing is the Day case. I'm sorry. The Day v. Bethlehem Central School District case, Western District, Pennsylvania, 2008. The Court ultimately held and they specifically said, look, the legislative history has been interpreted as being a broad catch-all defense, an exception, and it embraces limitless numbers of factors so long as they don't involve sex. And it said, and I quote, thereby persuading this Court that negotiation could be considered a factor other than sex. And that's a case out of the Western District of Pennsylvania. Most of the cases out there that would support our case hold that negotiation plus one other factor is enough to be a factor other than sex. On the flip side, in this negotiation, she was told she couldn't negotiate. The man was told he could negotiate or they didn't refuse to negotiate. And then we've got the subsequent comments by the very man that was dealing with the plaintiff that possibly a reasonable juror could take were discriminatory. So possibly that's a genuine dispute of material fact over whether it was based on the reason of sex that she did not, she was not allowed to negotiate. I would, in response to that, Your Honor, I would say that the evidence is, there is evidence in there that both parties were given the opportunity to negotiate. When Don Washington contacted each party, he contacted them on the same day by telephone. And they were each, at that point, they were each offered the opportunity to negotiate. The evidence shows on that, where she was offered the opportunity to negotiate by Washington. Because she was made an offer of employment at a particular salary. But he didn't expressly say, but this is negotiable. Most employers don't, Your Honor, with all due respect. Okay, but she asked Little, who's going to be her boss, I'd like to negotiate. And for the purposes of the summary judgment, you have to accept it's true what she says about that. It is not, HR makes these rules, it is not negotiable, that's the, I think of my law clerks. My law clerks are told this is the salary. You know, you have one year after law school or something, this is the salary. They're not going to call up President Obama or something and say we want more. I mean, it's weird to me to say to this woman, you cannot negotiate. This is a non-negotiable thing. And then hold it against her that she didn't know she should have called someone else. That's what I don't understand about your argument. There are many cases out there, Your Honor, where plaintiffs put forth the notion that they asked if they could negotiate. Or they asked, could I maybe get a little higher salary? Would you consider my experience? And the courts have said that's not a counteroffer. And they have said, on the other hand, where other individuals have demanded and said I will not come work for you unless you pay me $2,000 more. That that, there's a difference there. Okay. Do you have another case where the person was told you are not allowed to negotiate? Not just it's open-ended. Here's $41,000, and we just left it open-ended. But it's $41,000, I'd like to negotiate. No, it is non-negotiable. That's it. Do you have another case like this? There, I cannot think of the name of the case, but there is one other case where they weren't offered salaries at the same time. The female was already working there, and she was compared to a predecessor. And when she, three years earlier, negotiated her salary, they were told, or she asked if she could negotiate, and they said no, that's your salary. Then the guy came in later, the predecessor, and in fact negotiated his salary. I cannot recall the case. I apologize. I want to be very clear on this point. You stated that Washington told both of them that they could negotiate. When I asked you about it, you said, well, he made an opening offer and that that is sufficient. But he did not expressly say to her, this is negotiable. That is correct. He did not. All right. Thank you. So did anybody countermand what Little, you have to accept what she says, that Little told her it is non-negotiable, period, end of story. Did anybody countermand that? Is there any evidence that anybody else said anything different to her? We did not present any evidence to dispute that allegation. What we presented was evidence that Mr. Little had no authority to make such a representation, that she simply, that was a conversation they had during the interview process.  I think it's, I think another point that goes to that point is that HTC really has a very systematic approach to the way it hires employees. And they advertise. The guy gets to play on the court and the woman doesn't. That's the systematic approach to me. If the way in which HTC is going to be charged with what Director Little may have told the plaintiff is through apparent authority, there is no manifestation by HTC that he had such authority. But the problem that you have is it's your affirmative defense. We're not here to discuss whether contractually she has some cause of action for breach of contract. That's where this whole apparent authority would come from. We're looking at whether you've proved as a matter of law that there was a factor other than sex that played out into this textbook case of disparate pay for the same people doing the same job with the same credentials. And you all have happened upon this negotiation thing. And so now the question is, were these people playing a game under the same rules? Or was one handcuffed behind her back, told to go make a free throw, and the other guy was just given a ball and told to go make a free throw? And that's the question to me on a summary judgment on your affirmative defense. I mean, I'm not talking about trial. I mean, that's a whole other story. But just your affirmative defense on summary judgment. I think the court should look at it the way the district court looked at it. And that was it took – the thing about this case that's different than many other cases is the fact that both employees were offered the same salary at the same time for the same job. At that moment, they both had the opportunity to counteroffer. If you hold – well, I guess we're not talking about that point. But they both had the opportunity to counteroffer. She accepted what she was offered. He did not. As to the male applicant, correct me. You know the record better than I do. But so my recollection is that he came back with a specific counteroffer and that part of the justification for that was that he was already making a salary that was almost as high as what he ultimately was offered. Those are my words, but tell me what the record shows. I'm not trying to make the record myself. You're absolutely correct, Your Honor. He was already an employee at HCC, and he made $52,000 as his salary, which ultimately ended up being the salary that he was offered by HCC, the same salary he was already making. There are a number of cases out there that say that can be a factor other than sex, what someone made in a previous salary, as long as that is not the only factor. Which turns me to this comparison of these two individuals' resumes. I think that has been somewhat misrepresented. I think the record is very clear, and if you can go back and look, Corder's resume is at 217 through 227. Woody's is at 205 through 216. And looking at them, there are at least five differences that I can see with regard to Corder's experience. And I think this is what gets you over the hurdle of having to hold, well, yes, negotiation is the only thing we have, and that's a factor other than sex. It's not the only thing you have. Mr. Corder, educationally, they were almost identical, four years each, master's degree, but Mr. Corder also had an advanced degree in psychology, for what it's worth. Mr. Corder had been at HCC since 1999 through 2008, when they were both hired, as an HR trainer for nine years, and that's when he was making the $52,000 salary. He had also been a trainer as a senior medical trainer in Saudi Arabia for three years prior to that. He had given training to MD Anderson for two years, HR training. And he was also a training specialist for Prairie View A&M for three years prior to coming to his new job with HCC. On the other hand, Ms. Woody, oh, and he was an adjunct professor for HCC for many years, as was Ms. Woody, an adjunct professor. In addition to that, she had been an instructor at the Micro Center in Houston, keyboarding and other software program type classes. She had been a substitute teacher at Houston ISD. She had been an executive secretary, an administrative assistant, a sales assistant, and she claimed to be self-employed. And that was kind of an interesting situation. One of the reasons, well, not one of the reasons, but she claimed to be self-employed in three different resumes that she presented. She presented it three different ways. On the one hand, she presented that she was self-employed from 1994 to 1998. Another time, when she reapplied for another position, she presented that this self-employment was from 1994 to 2002. You know, all of this argument you're making now is not in your brief. In your brief, you spend about one page saying, alternatively, the male comparator's negotiation and his higher qualifications justified a higher salary. But I'm looking back through this, and I'm not seeing any of this. I suppose, you know, you do say he's more qualified, but certainly didn't brief that adequately. I understand, Your Honor. I just suggest a 12-hour conversion. You know, you realize that you better come up with something else today because it wasn't looking real good on a summary judgment. I will say this, Your Honor. It was in our reply brief at the – or our reply motion at the district court stage. No, we don't look at what's in the district court motion. We look at what you briefed to us. Let me ask you this. If we were to reverse on the summary judgment on the affirmative defense, what, in your view, would happen procedurally next? Your opponent says the case is over. Do you have a different view? I disagree. I think it would be vacated and remanded for further consideration. For what? We have a trial on the defense. Okay. Yes. And so that – then all this other junk could be brought in as well, this other stuff about the – Right. We can dig deeper. When she was self-employed in 1994 or not or whatever, and the jury could consider whether that really was the reason. Because it's still true, even if she was self-employed in 1994 or not, that if the reason was sex, then you've got a problem, right? Sure. Because the defense is because of something else. And this is why this case is so interesting to me because you always feel like only in law school is everybody like completely – every single thing they did in their life was exactly the same. And yet here we have pretty much everything is the same except for gender. And so that strikes me as if you're going to come in and say because of sex, you may convince a jury that it wasn't. Well, it was another factor. It was this thing. She was self-employed and he won or whatever. But you've got to – it's a matter of law to say that's true strikes me as very, very odd here. Because, I mean, you can always find something that's different. You know, she wore a more professional attire or a less professional attire. Somebody is always different. And this is the history of discrimination in our country is sometimes it's overt because you're a woman, I'm not going to hire you. Then it gets more subtle. Well, you weren't as professionally dressed as the other guy. You're not as aggressive. You're not as forceful. And so we really have to scrutinize that stuff, and it just doesn't strike me that a summary judgment is a good place for that. But at the same time, I think you might could win on trial. I'm not saying that. If the jury disbelieved her story about, you know, whether she was told that she couldn't negotiate and all that. But is that really a summary judgment? I think it can be, Your Honor, because in this case, like you said, the facts are so relatively clear compared to most cases that you might consider. And when you look at the defense and that it's a catch-all defense and it's there for a reason, it's there to allow for negotiation, to allow to look beyond the idea that all persons should be paid in an equivalent manner and equivalent pay, regardless of the other reasons. It's there for a reason. And here, as the court pointed out below, the opportunities to obtain a particular salary were equal. They were offered the same salary at the same time. One side of the differential was established when she accepted that offer. I don't want to go back over the – I mean if you read what she said, she wasn't given the same rules for negotiation. It's hard for me to say he's such a much greater negotiator when he's allowed to and she's not. I mean you're a better basketball player if you're allowed to play than if somebody's not. Michael Jordan is benched. He's not as good a player as you if you're allowed to play, and he's not. How about addressing the gender discrimination and whether even if we reversed on the EPA claim, the gender discrimination claim could be affirmed? Well, the Title VII claim was dismissed because of the fact that the court below found the EPA defense and that that is tied in through the Bennett Amendment into the Title VII. And so that was the reason it was also summarily dismissed. I think if the comments, the alleged comments are the basis for the Title VII sex discrimination, they don't rise. There's many cases in this circuit. They don't rise to the level of even creating a prima facie case. But they're evidentiary of this guy's mindset in telling her a different set of rules. You would agree with that? I mean I agree that they don't create a hostile environment by themselves. Somebody's going around saying, well, I think the woman shouldn't make as much because the man's a breadwinner and this kind of stuff. That may not be a hostile environment, but it is evidentiary of his mindset in telling her she's not allowed to negotiate. Those types of comments might be, but not the comments we have in this case. He said, you remind me of my mother. He called her blonde and he called her deany, and that's it.  I agree it's by itself not actionable, but I think – well, I don't know if she accepts the clarification of the EEOC attorney, but that I think is a different position. What about the retaliation? Is that out of the case? Yes, I think it is because the retaliation is – the adverse employment for the retaliation is the lower salary, which was set at the time she was hired. She's claiming the conduct, the retaliatory conduct was after I complained about this, my salary remained low. That just doesn't – there's no causation there. And again, I could certainly be wrong. I thought the retaliation she claimed was that her ratings went from exemplary to professional. That was another basis, Your Honor, that was summarily dismissed. And that that was done prior to her complaining to the company about something else that would possibly be the protected activity. So the causation might be missing. Correct. I think ultimately, as a de novo review, you can look at the record and see that the evidence is there, that at least two factors, negotiation as well as credentials, are there for the decision to have not or to fall under the Fourth Defense. I think you could also go further and establish a guideline for this circuit, for employers and employees alike, that negotiation or negotiation plus one is a factor other than sex under the right set of facts. Thank you, and my time is up. All right, thank you, Mr. Bradshaw. Ms. Penagos, you've saved time for rebuttal. Do you accept that clarification that you're not claiming that these comments are independently actionable, but rather that they're evidentiary of the disparate pay claim? I'm not claiming that. I'm only claiming that the paragraph 16 of our complaint, footnote 105, lists out a lot more than what Mr. Bradshaw said. He said, Princess Dingy, you remind me of my mother, blonde, when she's African American. And then the text messages about you know what to do, let your husband work. The point being, these comments are not, you're not claiming that they create a hostile environment. No. You're claiming that they're evidentiary of his mindset in setting up a different set of rules or whatever. The EPA does not require intent, but it welcomes it. Mr. Little's 21-day silence, the fact that he made these statements, indicates his mindset that he kept silent because she's a woman. You're not answering my question. Okay. What is the relevance of these remarks to you? The relevance is that a jury could infer that she was not given the opportunity to negotiate by Mr. Little because he had a gender-biased mindset. That's it. HCC cites— And what are you using to benefit, damage-wise or other, from the gender discrimination claim? I mean, does it offer some sorts of remedies that the EPA claim doesn't? Yes. I mean, I think it was pled because of the statements. It was not our major cause of action. We are complaining here because the district court dismissed the claim when there was no motion pending. She's still employed there. Yes. So are there any damages you could obtain under your Title VII gender discrimination claim that you could not obtain under your EPA claim? I suppose mental anguish-type things, but I'm not—we didn't get that far. We did no discovery. But HCC cites in its brief a number of cases where courts have discussed negotiation and answer your question, Judge Haynes. Each one of those cases, they were performing a different job, established a different defense, or had greater skills. You asked Mr. Bradshaw if he knew of any case where negotiation was disparately provided. The case he cites in his brief is Day v. Bethlehem out of the Western District of Pennsylvania. It's unpublished. In that case, the school's motion for summary judgment was denied by the district court, and the court explained, quote, a reasonable fact finder could view the defendant's testimony that the male insisted on negotiating while the female did not was in reality the defendant's refusal to negotiate with women while accepting the insistence of the man. I mean, this stuff is subtle. That's the problem with these kinds of cases, and typically it's much more convoluted than this. I mean, like I said, to me this seems like such a— I did want to point out there was some discussion about whether she should have jumped up and down and said, I want to negotiate too. Mr. Little, she interviewed her in February. That's uncontested. He told her then the salary is on—before she got the offer, the salary will be non-negotiable. So when she spoke to Mr. Washington, she was already told that. It didn't happen—she didn't have a reason to tell Mr. Washington. You have the problem that if she does go over Mr. Little's head and he's going to be her boss, I mean, I don't think we should say as a matter of law you should go over your boss's head in order to preserve your right to be paid properly under the law. I believe that the record reflects that Mr. Corder was working in the HR department, so maybe that's the reason he asked Ms. Epps, you know, hey, is there a negotiation here? Because they both asked the same question. And the male applicant was not told at any time that there's no negotiation. Is that right? There is no record evidence of that, no. There's no record evidence one way or the other? Right. We didn't do discovery in this case. Why not? We didn't what? Judge Hughes didn't allow discovery. He wanted motions. Well, no, that's what Rule 56D is for, that you can ask for discovery. Did you file—did you request discovery and or file a Rule 56D motion? No, we felt that we had a good summary judgment motion on the inability to have— it disparately provided negotiations as a defense, so we filed cross motions. We talked about prior salary being a justification for disparity. The Youngblood case, July 1st, that was in our Rule 28J, specifically says that prior salary cannot justify wage disparity. And, moreover, prior salary cannot justify ongoing salary disparity, year after year after year, particularly here where Woody's performance is better and she raises more money. But the skills comparison that Mr. Bradshaw talked about was not the basis of the district court's decision. There was no comparison of skills. All right. Your time has expired, Ms. Panagos, and your case is under submission. The court will take a brief recess.